UNITED STATES of America

v.

David LACE.

UNITED STATES of America

v.

Roger DUCHARME.

UNITED STATES of America

v.

Gary BUTTS.

UNITED STATES of America

v.

Patricia ECKMAN.

UNITED STATES of America

v.

David SOUTHAM.

UNITED STATES of America

v.

Daniel LACE.

UNITED STATES of America

v.

John RADZIKOWSKI.

UNITED STATES of America

v.

Paul RYZEWIC.

UNITED STATES of America

v.

Glenn POLLACK.

Crim. Nos. 79–44–1 to 79–44–9.

United States District Court,
D. Vermont.

Oct. 30, 1980.

William B. Gray, U. S. Atty., Karen McAndrew, Asst. U. S. Atty., Burlington, Vt., Peter W. Hall, Asst. U. S. Atty., Rutland, Vt., for plaintiff.

Clifford J. Steele, Atlanta, Ga., James P. Carroll, Carroll, George, Hill & Pratt, Rutland, Vt., for defendant David Lace.

Paul J. Cambria, Jr., Lipsitz, Green, Fahringer, Roll, Schuller & James, Buffalo, N. Y., Joseph M. O'Neill, Rutland, Vt., for defendant Ducharme.

Robert G. Fierer, Atlanta, Ga., Stephen A. Dardeck, Tepper & Dardeck, Rutland, Vt., for defendant Butts.

Ellen Mercer Fallon, Langrock, Sperry, Parker & Stahl, Middlebury, Vt., for defendant Eckman.

Harry R. Ryan, III, Ryan, Smith & Carbine, Rutland, Vt., for defendant Southam.

Robert P. McClallen, Rutland, Vt., for defendant Daniel Lace.

Saul L. Agel, Agel, Carroll & Sussman, Burlington, Vt., for defendant Pollack.

## FINDINGS OF FACT AND CONCLUSIONS

HOLDEN, Chief Judge.

The indictment filed in this court on December 6, 1979, charges that on or about May 16, 1979, in the District of Vermont, the defendants David F. Lace, Roger R. Ducharme and Gary Butts did unlawfully possess, with intent to distribute, approximately 457 pounds of hashish and approximately 100 pounds of marijuana, Scheduled I controlled substances, in violation of 21 U.S.C. § 841. The first count charges the defendant Patricia Eckman with aiding and abetting in the commission of this offense.

Count 2 charges the same persons named in Count 1, together with the defendants David Southam, Daniel Lace, John D. Radzikowski, Paul Ryzewic and Glenn Pollack, with conspiracy to violate Sections 841 and 846 of Title 21 of the United States Code during the period from October 1, 1975 to the date of the indictment.

The third count of the indictment charges the defendants David F. Lace and Roger R. Ducharme with a series of violations of 21 U.S.C. §§ 841 and 846, as organizers of a continuing criminal enterprise in violation of 21 U.S.C. § 848, deriving profit and property interests which it is alleged are subject to forfeiture under the provisions of 21 U.S.C. § 848(a)(2).

The defendants Radzikowski and Ryzewic have not been found and are in fugitive status.

Following their arraignments and the entry of not guilty pleas, the several defendants presented in the aggregate, more than eighty pretrial motions individually and collectively. Those motions not advanced by a particular defendant have been adopted by the remaining defendants in a blanket effort to obtain any and all relief to be derived from the related motions by their codefendants. In response to the combined motions to suppress, the court conducted protracted evidentiary hearings during a period of more than fourteen days.

Upon consideration of the evidence presented and the oral and written submissions of counsel, the court finds the facts as reported below.

### FINDINGS OF FACT

During the hours of darkness on May 16, 1979, an armed detachment of Vermont State Police executed a search warrant on premises rented to the defendant Gary Butts, located in Sharon, Vermont. The search warrant was issued on May 15, 1979, by the Honorable Charles Bristow, a judge of the district court of the State of Vermont. The subject premises were jointly owned by Mr. and Mrs. John C. Heine and Mr. and Mrs. Frank Berkman, all of whom were residents of the Commonwealth of Massachusetts.

#### *The Subject Premises*

Butts came to occupy the property as a result of his response to an advertisement

that was published in the Valley News, a newspaper with circulation in the Sharon area. The advertisement offered the property to include "70 acres of land" at $325.00 a month. Negotiations for leasing the property were conducted by Mr. Heine and Mr. Butts in late August and early September 1978. The property consisted of a frame dwelling house with two wooden barns and approximately 70 acres of land and included a one acre pond nearby the dwelling that the owners used for fishing and swimming. There is a frontage of 1,400 feet on an unimproved town road, known as Beaver Brook Road, that intersects a portion of the property. The larger barn was used by the Heines and Berkmans as a two car garage with an attic overhead. The smaller barn served as a single car unit. The premises were shown to the defendant Butts on his first visit in August. Rental terms were discussed. Butts indicated he was not prepared to make a firm commitment, but would call the owner later.

While Mr. Heine was occupying the property on a subsequent weekend, Mr. Butts came to see him to further discuss a renting arrangement. Heine informed Butts that the owners proposed to rent the house and the small barn for the tenant's exclusive use; however, the owners proposed to use the remainder of the property for recreation as they desired during the tenancy. Butts requested and received permission to use the large barn for installation and use of woodworking machinery. Heine also informed Butts that the owners had granted permission to use the pond to some of their neighbors and that permission would continue. The rental discussion included a showing of the area adjacent to the dwelling house, around the lawn and the pond. It was understood that the owners and tenant would share in the use of all the property except the dwelling and small barn. The term of one year at a monthly rent of $310 was agreed and one month rental was advanced as security at this meeting. The owners understood the property was to be rented and occupied by Butts, and from time to time—his invited guests. There was no discussion by Butts that the premises

would be occupied by any of the other defendants and they were unknown to the owners.

Although Butts undertook to rent the leased premises for the period of one year from September 1978, a dispute developed with the owners in May 1979 concerning the payment of rent. No rent was paid for the months of June, July and August 1979. During Butts' occupancy the owners did not visit the premises from September through May.

During Butts' occupancy the front and west side of the residence faced Beaver Brook Road. The larger of the two barns is situated slightly to the south and east of the residence, at a distance of approximately 30 feet. The southeast corner of the larger barn is nearly contiguous to the northwest corner of the smaller garage unit. A gravel driveway extends east from Beaver Brook Road to the barns, where it widens into a parking area. Easterly from the barns, a pathway or trail extends from the parking area to the east, a distance of approximately 60 yards, where the trail forms a T with an old logging road that extends north and south in the wooded area, about 75 yards from the residence. The pond lies southeasterly of the residence and outbuilding, a distance of approximately 50 yards over an open grassy area.

The logging road is upgrade from the dwelling house. View of the house from Beaver Brook Road is somewhat limited since it is at a higher elevation from the roadway. The barns and parking area are entirely visible from the road. Access to the residence and outbuildings from the north and east can only be gained by traveling through the wooded area to the east,—and more easily by way of the logging road.

Near the southeast corner of the house is a back door with a half window. North of the door are two elevated small windows and two regular sized ten pane windows, all facing the east.

Of the seven defendants who have all joined in the motion to suppress, only the defendant Butts occupied the premises as a

lessee. Butts informed Heine during the leasing negotiations that he wanted a quiet place in the country where he could invite his parents to come and stay with him. Heine testified that while Butts was not restricted from having guests, the owners did not intend that to mean roommates.

A sign stating "No Trespassing, Hunting or Fishing," designating the owner of the property to be L. W. Brooks, was found lying on the ground under leaves by the witness Burchard, who surveyed the property in December 1979. The premises were not posted by owners Heine and Berkman and during the seven or eight years of their ownership the property was open to anyone who chose to hunt there.

At the time of the surveillance David Lace resided with his wife in Quechee, Vermont. David Lace testified that he understood Butts lived in the Beaver Brook Road house and he visited the premises to fish from time to time, but his visits were infrequent.

Roger Ducharme was observed at the Sharon property from time to time and was with David Lace when the search warrant was executed. Ducharme maintained a residence on West Hartford Road in the Town of Quechee. He was known by Lace to have dated Patricia Eckman prior to May 16, 1979. Ms. Eckman was at the Ducharme residence on the night of May 16.

Of the persons observed at the Sharon property during the period of surveillance, only Butts was shown to have resided or lived at that location. Butts was the only person known to be present at the premises other than the officers who executed the search warrant. No evidence was presented to establish that any of the other defendants lived in the Sharon house during the time it was under surveillance. During this same period numerous cars and light trucks were observed entering the driveway and parking areas, but they remained at the location for relatively brief periods of time.

At the time of the search the house was meagerly furnished with a chair, a sofa, two beds and a stereo record player. During the surveillance Ms. Eckman was observed carrying what appeared to be bags of groceries into the house. Dishes were found in the house, along with various items of personal clothing. Also a set of drawings, books and papers, identified as the property of Roger Ducharme, were located in the kitchen. A box containing personal papers of Gary Butts was reported in the inventory as having been found in the east bedroom on the second floor.

### Surveillance at Sharon

The property as thus described came under preliminary surveillance early in March 1979 by Corporal Robert J. Vallie and Trooper 1st Class Roy Holton, members of the Special Investigative Unit of the Vermont State Police. The observation was undertaken as a result of related investigations by the Special Unit that had been ongoing since July 1977, but was more particularly initiated as a consequence of information supplied by a confidential informant, one Kenneth Schrager, whom the officers regarded as reliable by reason of earlier investigation.

Schrager informed Corporal Vallie that he had purchased substantial quantities of controlled substances from the defendants David Lace and Roger Ducharme until he was arrested in March, 1979. He told the police that the drugs involved in the distribution by David Lace and Ducharme were principally stored at two locations: the Sharon property occupied by Gary Butts, who was reported to be a cousin of Ducharme, and the residence of David Southam, known as the Temple Schoolhouse, occupied by Southam and his wife in Benson, Vermont.

On March 9, 1979, Officers Vallie and Holton located the Sharon property by following directions given by Schrager. In early April the premises were observed from the highway and property to the west of the road to plan more intensive surveillance. On April 23 or 24 a twenty-four hour surveillance was planned and initiated. Some 24 to 30 officers, working in eight hour shifts, kept the residence and barns

under watch from three previously established observation posts. The points were designated in the evidence as A, B and C. Observation post A was located in the wooded area, just east of the logging road, north of the T intersection where the trail from the driveway joined the logging road. Point B was located in the woods at the southeast edge of the pond. Point C was located a short distance south of B, at or near the swamp area at the southern extremity of the pond. Access for the purpose of establishing and observing from these points was gained by covertly moving south along the logging road. Observation of the house and adjacent buildings was not confined to sightings from the established posts; rather the police moved from one point to another and as close to the house as the circumstances would permit without disclosing the surveillance activities.

The primary purpose of the surveillance was to discover substantial quantities of controlled substances moving in and distributed from the area. This objective was in line with information supplied by the informants concerning the use of the premises for warehousing large quantities of narcotics. That is not to say that observation of the interior of the dwelling was precluded; the surveillance teams observed any and all activity in the house that could be observed with the naked eye and such visual implementation that was available and operative.

The surveillance points were established by the police without knowledge on their part of the exact boundaries of the Heine–Berkman property. Testifying at the evidentiary hearing, Mr. Heine stated, in retrospect, that the owners had no objections to the state police entering and being on the premises "in lawful pursuit of crime."

*Use of Optical Instruments in Surveillance*

During the course of the surveillance at Sharon and Benson the members of the detail assigned to the project had available several types and models of optical instruments to enhance their unaided vision of the target area. The basic instrument used by all of the visual surveyors was field binoculars, 7 × 35 power, with a "zoom" device capable of increasing vision to 12–power.

The spotting scope used was a variable 20 to 45 power Bushnell, of the type frequently used in rifle competition or target practice to observe the marking on the target of the shot fired. This type of instrument is also in general use by law enforcement agencies, the military and is available generally to the public in retail stores.

The police had available an instrument identified as a Javelin night–scope, when properly functioning and operated has the capability of magnifying existing light up to 50,000 times and magnifying the object viewed to the power of 1.8. Such an instrument was loaned by the Central Equipment Company to Lieutenant Michael Galvin of the Vermont State Police. There was evidence that when the equipment was returned to the lender, Lieutenant Galvin reported it "did its job." There was no evidence that it was effectively used at the Benson or Sharon surveillances. The evidence, including that of Lieutenant Galvin, is to the contrary and to the effect that the Vermont State Police did not and could not make effective use of the Javelin. No evidence was gathered at the surveillance points by use of the Javelin.

A similar device, designated as an Owl's Eye, was tried at Benson for a period of about seven days to no avail. The barrel of the instrument is approximately three feet in length and it has a viewing screen. The device is electrically powered and was employed only at Benson. No effective use was made of the instrument.

Limited use of a Questar lens was made during the surveillance of the Sharon property. Questar has utility both as a telescope and as an attachment for photographic purposes. It is light weight, easily portable and used in observing and photographing wild life, in biomedical work, and amateur astronomy, as well as law enforcement work. It has the capability of observing details not observable with ordinary lenses with minimum magnification of 28 power when used photographically, and visually,

40 power. Various attachments, available for use on the Questar, can enlarge magnification to a maximum of 130 power. The Questar equipment was used to ascertain identification of people and license registration numbers. The only photographs taken with the Questar device were in black and white prints. The telephoto lens was 4 power, which increased to 8 power by attachment of the extender.

Basic photographic equipment was used from day to day when the weather permitted. The camera generally used was identified to be a 35 mm Canon Model QL, equipped with a 200 mm Steinheil–Munchen lens. A 2–power extender might have been used as an attachment. The Canon camera was also used with the Questar lens. One of the police photographers, Corporal Miller, tried unsuccessfully to implement the camera with the Questar attachment. Another photographer used the telephoto lens to take three or four random shots from the logging road.

Another photographer, Corporal Farmer, used the telephoto lens but once; the Questar on two occasions. The defendant's expert, Donald Cupitt, employed by the Questar Corporation, testified that Gov. Exs. 24, 25, 26 and 27 were taken with a 1½ power attachment which produced total magnification of 42 power.

At Sharon infrared night goggles were used by the nighttime surveillance team to facilitate ingress and egress to the established observation points as they traveled through the wooded area along the logging road. This equipment served no other purpose in the surveillance.

Observation conducted at the Benson location was made of the Temple Schoolhouse from one fixed point, being a camp located approximately a quarter mile distant. From this point surveillance of vehicles arriving and departing was conducted. On occasion officers engaged in the surveillance approached to within fifty yards of the Southam residence without any appreciable success. The only photograph of the schoolhouse was taken from a police van moving along the highway.

The police experimentation with the sophisticated optical equipment did not produce the spectacular results that the manufacturers' representatives had testified to concerning the capability of the equipment. There was no need to employ the magnified illumination features of the Questar since the principal target of the observation was the dwelling house. Different rooms in the interior of the structure were illuminated by electric lighting that in one part or another continuously burned during the hours of darkness, with window shades undrawn. Questar was used by Corporal Farmer for taking photographs on two days; May 10 and May 15 from Point C. The photographs taken with the aid of the Questar were not identified. Most of the observation was carried on by use of 7 × 35 binoculars and the 20 power spotting scope.

With the aid of optical instruments, police observation penetrated interior parts of the farmhouse.

### Interior Observations

After dark on April 24, Corporals LeClair and Miller observed four persons in the kitchen area who appeared to be wrapping packages with white paper over a period of an hour. During the process one of the persons, a female subject, appeared to be rolling a cigarette that she passed around to the others. In front of a kitchen window she held a plastic bag that appeared to contain green plant material. The female person was later identified by the officer to be Patricia Eckman. One of the male persons, later identified as Gary Butts, was observed taking some substance from a counter, placing it to his nose and "sniffing his head back." This person made reference from time to time to a road map.

During a subsequent surveillance, apparently in early May, two other persons seen in the kitchen were later identified as David Lace and Roger Ducharme. One of the persons, identified as Ducharme, appeared to be counting a sheaf of papers which Corporal Miller believed to be currency.

*Exterior Observations*

State Police Officer Farmer worked the daytime surveillance shift on some thirteen days. Most of his observations were from Point C, where he could see the east side of the house, the driveway and garage areas. He observed the presence of Ms. Eckman and Daniel Lace on the Sharon property. He saw Ms. Eckman transport three paper bags in two trips from the barn to the house. Later he observed the paper bags placed in three separate vehicles which departed from the premises. One vehicle was registered to Roger Ducharme. Farmer also observed Ms. Eckman carry what appeared to be lightweight boxes from the house and return with boxes that appeared to be heavy.

On May 10 Farmer observed Daniel Lace enter the garage and return to the house with a white plastic bag. A white plastic bag was later removed from the house and placed in a vehicle which departed from the parking area. The vehicle was registered to Glenn Pollack.

On April 25 Corporal Farmer observed Ms. Eckman remove flight bags from the trunk of a vehicle identified as belonging to Roger Ducharme. There were two bags which were separately removed during the day. Two similar bags were later placed in the trunk by Ducharme. He also placed a paper bag and a notebook in the car and departed. These observations were made by use of two sets of binoculars; one 7 × 35, the other of a zoom type with magnification of 8 to 12. The 20–power spotting scope and the Questar lens attached to the camera was employed.

The defendants called as one of their witnesses Richard Brannen, a licensed and practicing optometrist of Rutland, Vermont and Hanover, New Hampshire. Dr. Brannen testified he entered on the Beaver Brook property in mid–May 1980, where he conducted various visual experiments in the vicinity of the observation posts, directing his view from these points toward the house and outbuildings. His observation was conducted with the naked eye and with the aid of binoculars 8 × 30, a 45 power scope and

use of the Questar lens. All exterior features of the east side of the house were observable without visual aids. Large objects could be readily seen; small objects were more difficult to identify.

By use of binoculars, objects in the interior of the house became visible. A vase holding white flowers was identified and detail of smaller objects could be discerned. By use of the spotting scope license registration numbers could be identified. Use of the Questar enabled the observer to identify lettering on a package of cigarettes placed on the windowsill. A business card placed on a truck in the driveway could be read. These experiments were conducted from south of the pond. Other observations varied according to the location of the observer and the terrain.

Other observations were made, designed to compare the experimentation of the witness with the evidence presented by the members of the surveillance team. Mindful that the observations of the witness and the police were made at different times, under varying circumstances and locations, the expert's testimony in some respects affected the weight of the officers' evidence in certain details; in other respects it corroborated the testimony presented by the Government.

During surveillance conducted by Trooper Roy Holton and Corporal Michael LeClair on April 28, 1979 in the early evening in the vicinity of Point A, they detected what they believed to be a strong odor of dried marijuana. The wind direction at the time was from the buildings toward the observation post. No observation of the origin of the odor was made. There was no evidence to indicate large quantities of marijuana were ever exposed to the atmosphere. To the contrary, the evidence was to the effect that large quantities of the substance were confined to plastic garbage bags lined inside metal garbage cans. The wind direction referred to by the officers was consistent with testimony by the witness Sobel, a weather reconstruction expert called by the defendants to establish the weather patterns during the surveillance period. A fo-

rensic psychopharmacologist, Ronald Spiegel, also summoned by the defendants, testified that hashish gives forth very little odor. His experience was such, according to his testimony concerning use of canine detection, that a dog would have to be inside the building where marijuana was stored in plastic bags in a garbage container to enable detection of the substance. The witness testified that under the weather conditions prevailing on April 28, 1979, the possibility of detection at a distance of 200 yards was about 5%. The court has no doubt that the officers believed they detected the odor of the plant. However, the detection could well have unintentionally been the product of the officers' imagination. In any event, the identification of the substance by odor at a distance of 200 yards from the source did not constitute a reliable contributing factor to the establishment of probable cause.

### Informant Information

Standing separate and apart from the facts disclosed by the confidential informants, the observations made by the surveillance teams produced relatively few facts that had not previously been disclosed by prior investigation and questioning of the informants. However, the surveillance had a strong persuasive effect in confirming and corroborating information previously developed by the Vermont State Police. More particularly, the surveillance verified in a substantial way, prior police information gathered before the surveillance was undertaken.

Schrager informed that he had participated in extensive transactions with the Lace–Ducharme operation from 1975 to the date of his arrest, just prior to the beginning of the surveillance. He described the use of stash houses at Sharon and Benson. Both premises were located by directions provided by Schrager. On April 4, 1979, Trooper Holton observed a Silver Mercury automobile, registered to David Lace, parked in the driveway at Sharon. The observation was made from the west side of Beaver Brook Road. David Lace was ob-

served as an infrequent visitor as the surveillance continued. The defendant Ducharme was a more frequent visitor and remained at the Sharon house for longer periods. These observations were in keeping with the participation of each individual as described by the informant.

Butts was described as the person responsible for operating the stash house at Sharon. He was the person most regularly observed at the location and the presence of his vehicle was noted on a continuing basis. David Lace testified that Butts lived there.

David Lace's brother Daniel was described as a recently accepted associate of the partnership. He and his motor vehicle were frequently observed at the location. David Southam was connected to the organization as a result of a prior investigation at the Bailey–Rawson House, a restaurant once operated by Lace in Jamaica, Vermont, until December 1977. On that occasion Southam, while employed at the restaurant, told undercover police officers that their identities were known. Southam was observed during the surveillance at Sharon on one occasion and was seen meeting with Butts in New Hampshire. Southam's pickup truck was also observed at the Ducharme residence.

An affidavit signed by Trooper Roy Holton was also prepared and signed.

### The Search Warrants

The information gathered as a result of prior police investigations, that derived from two informants and the observation made during the surveillance at Sharon and Benson, was combined in the two affidavits signed by the police officers. On May 15, 1979, Corporal Vallie and Trooper Holton, jointly and in person, submitted the affidavits in support of their application addressed to the Honorable Charles Bristow, Judge of the Vermont District Court, to obtain a warrant to search the house and outbuildings on Beaver Brook Road. On the strength of the information presented, Judge Bristow issued the warrant. The affidavits, application and the warrant, together with the officers' return, were re-

ceived in evidence as Government's Exhibit 1.

The warrant was executed after dark during the evening of May 16, 1980. The search was conducted by a sizeable detachment of armed state police officers who conducted the search of the house and outbuildings at the Sharon premises. The only person found in the building was the defendant Gary Butts. The inventory filed in the officers' return attached to the warrant disclosed substantial quantities of suspected hashish in cardboard boxes designated "3C" and "5F" in the upstairs east bedroom. Empty boxes similarly designated were found. Two sets of beam scales, a Winchester 12 gauge shotgun and shells were located in the bedroom and adjoining closet. Cash in the amount of $5,000 was found in a bureau drawer in the west bedroom. Marijuana and related paraphernalia and hash oil were found at different locations. Books of record, including addresses, were also seized.

Search of the garage yielded large quantities of suspected blocks of hashish, contained in plastic bags and placed in designated boxes. Plastic trash barrels with letter designations containing suspected marijuana were seized, along with empty marked boxes, a balance scale and varied wrapping and packaging materials.

As a result of the evidence seized in the search of the Sharon house and garage, Corporal Vallie made a judgment that there was probable cause for the arrest of the defendants David Lace, Ducharme and Eckman. He telephoned this information to the Bethel barracks with directions that these persons be arrested and held if and when found. This directive was communicated to state police in the area.

*Arrest and Statements of David Lace and the Search of his Vehicle*

While the search was underway, shortly before midnight, a 1978 Mercury Marquis, registered to David Lace, drove into the driveway and parked by the garages on the Sharon property. Three or four armed state police officers converged on the vehicle from concealed points where, after prior alert, they awaited the vehicle as it approached the yard. The Lace vehicle was occupied by David Lace in the operator's seat and by the defendant Ducharme on the passenger side. The officers, with drawn sidearms, identified themselves as state police and forcibly removed the occupants, asked for identification and preliminarily patted down for weapons. Lace and Ducharme were placed under arrest, secured by handcuffs and removed to the Sharon residence. Ducharme was removed to an upstairs bedroom. Lace remained in the living room on the first floor. He was subjected to a strip search at Sharon.

Corporal LeClair was able to identify David Lace from observations made during surveillance. The officer confronted David Lace in the living room and inquired whether he understood his rights as a subject under arrest. Lace responded "Not positively. I'd like to hear them." The officer read to him his rights and privileges according to *Miranda* from a prepared writing. Lace responded that he had nothing to say. He made no request for an attorney at that time.

During the hours of 9:30 P.M. to 12:30 A.M. the police removed the telephone receiver to prevent incoming calls and no outgoing calls were permitted except by the officers on the premises. At 12:30 A.M., or shortly thereafter on May 17, David Lace was transported from the Sharon place to the Bethel police barracks where he remained handcuffed during processing, except during his use of the washroom facilities. Later one of his wrists was uncuffed and he was handcuffed to an adjacent chair or filing cabinet in the police barracks while the officers attended to other processing.

David Lace is an informed and enlightened person with four years of collegiate education. He testified he was not under duress during his post arrest detention. He declined to sign fingerprint identification until he had read and examined the document.

The Lace vehicle was towed to the Bethel barracks. After 4:00 A.M. Corporals Ruggiero and LeClair undertook to inquire of David Lace to find out if he would consent to a search of his Mercury automobile. Corporal LeClair referred to the lateness of the hour and pointed out that Lace's consent to a search would save a lot of time that would be required to obtain a search warrant. Lace replied he would be willing to permit a search on one condition–to the effect that whatever was found in the search of the vehicle, he (Lace) didn't know anything about. Corporal LeClair read the text of the consent form aloud. Lace read its content to himself, understood it and signed it. Lace testified he also "understood they were going to search it now or search it later." During the half hour conversations with the police that preceded the signing of the consent form, there was no request made by the defendant Lace to contact his attorney.

Lace testified that sometime after he had signed the consent form and he and Ducharme had been offered and received coffee, Trooper Holton noticed Lace's wedding band and then offered him the opportunity to call his wife. Lace then called his wife and requested her to call his attorney, Clifford Steele, and instructed her how to locate Mr. Steele's business card. He further testified he instructed his wife to "clean the house." On cross–examination he testified he was concerned about the presence of a small quantity of marijuana in their home.

The written consent was signed by the defendant Lace in the presence of Corporal LeClair, who witnessed the signing. It states:

I, DAVID LACE, having been informed of my constitutional right not to have a search made of my premises hereinafter mentioned without a search warrant and of my right to refuse to consent to such a search voluntarily authorize M. LeClair and N. Ruggiero, Officers of the Vermont State Police to conduct a complete search of my (car) located at Bethel, Vermont. These Officers are authorized by me to take from my (car) any letters, papers, materials or other property which they desire in connection with a pending investigation being made by them. This written permission is being given by me to the above mentioned Officers voluntarily and without threats or promises of any king [sic].

When David Lace and Roger Ducharme were arrested on their arrival at the Sharon property, the Lace vehicle was locked and so remained until after the consent was signed. With the written consent in hand, the state police unlocked the Lace vehicle and conducted a complete search of the vehicle. The police found and seized $185,-000 from the vehicle.

Following the search, Sergeant Shedd approached David Lace to inquire whether he would cooperate with the state police. Lace informed Shedd he would be more inclined to cooperate with the "feds"; that he didn't think he could help at the state level. Shedd testified that Lace went on to say that if he decided to cooperate "he could probably give names of judges, attorneys, members of the Coast Guard and so on." However, he indicated he was fearful about cooperating. He declined Shedd's request to visit with him at his home, but received from Shedd the telephone number where Shedd could be reached if he decided to cooperate. Lace acknowledged that he knew Shedd from the 1979 investigation in which Shedd participated at Jamaica and knew Shedd to be a police officer. Lace declined to discuss the 1979 investigation any further. The subject was concluded with Lace's indication that if he decided to cooperate he would communicate with Shedd. He suggested that in that event perhaps they could meet at some location while fishing.

During the course of his discussion with Sergeant Shedd and Corporal LeClair, Lace informed the state police that they had "apprehended the biggest people in Vermont"; that the police had "gotten all the drugs they had in their possession,"–and Sharon was the only location in Vermont with a supply like that. Corporal LeClair, at some point queried how the money got in

Lace's car. Lace indicated he had gone to Ducharme's home to repair a motor vehicle, but he didn't know anything about the money that was found in the trunk. Lace, however, denied he answered any questions.

Lace testified that the officers asked him if he would cooperate, but that his answer was negative; he denied all other aspects of the discussion about cooperation. Sergeant Shedd's testimony about cooperation was corroborated by Corporals LeClair and Ruggiero. In the light of all the circumstances, the court finds the testimony of the state police officers to be credible.

Sometime after David Lace telephoned his wife from the Bethel barracks, Sergeant Shedd received a call from Clifford Steele, Esquire, Mr. Lace's counsel in Atlanta. In this connection Mr. Steele represented to the court that on the morning of May 17 he received a call from Mrs. Lace informing him that her husband had been arrested by the Vermont State Police. She provided Mr. Steele with a listing, from the local telephone directory, of ten telephone numbers for various state police barracks. At 6:50 A.M., on his third call from the list, Mr. Steele reached Bethel and Sergeant Shedd. He was then informed in detail of where and when Mr. Lace would appear in court. The attorney instructed the police against any further interviews with his client and no further questioning was conducted.

### Arrest of Patricia Eckman

By prearranged plan, the Ducharme residence in Quechee was kept under watch while the search of the Sharon premises was in progress. Corporal Thomas Fields, who was assigned to this watch, was called as a witness by Ms. Eckman's attorney. He testified that shortly after midnight on May 16, 1979, while in uniform, be observed the Ford LTD, registered to Ducharme, depart from the Ducharme residence on the Hartford–Quechee Road. Officer Fields followed the car for a couple of miles and then stopped the vehicle by activating his dome lights. The stop was made pursuant to radioed instructions from Corporal Vallie. They were shortly joined at the scene by another officer, Dimmick, who was in the vicinity on the same detail. Ms. Eckman's dog was in the vehicle. She was asked to provide license identification. Ms. Eckman was allowed to remain in the vehicle with keys in place while Fields returned to his cruiser to radio for further instructions. Corporal Fields received instructions this time to arrest Ms. Eckman, transport her to Bethel and arrange for towing the Ducharme car to that location. Ms. Eckman was asked to step out of the vehicle. She was superficially observed to ascertain if a weapon could be seen without touching her person. She was informed she was under arrest and Officer Fields read *Miranda* warnings to her. She was not questioned by the arresting officers. The vehicle she was operating was brought to Bethel by a tow truck. At the Bethel barracks Ms. Eckman's handbag was searched.

### Other Search Warrants

Sometime before midnight on May 16, 1979, Corporal Vallie left the Sharon premises and returned to the Bethel barracks. The substance of the affidavit previously made for the search warrant at that location was revised and supplemented by including, in general, that large quantities of marijuana and hashish had been found in the execution of the first warrant. The affidavit was submitted in support of Corporal Vallie's application to Judge Bristow, requesting a warrant to search the residence of Roger Ducharme in Quechee and the Ford LTD registered to Mr. Ducharme. The application and supporting affidavits were presented to Judge Bristow at the motel where he was staying in White River Junction sometime between midnight and 2:00 A.M.

Officer Vallie's appearance before Judge Bristow was not unexpected for the possibility that additional warrants might be sought was previously indicated. At the time of the second application Corporal Vallie discussed the results of the initial search and displayed a sample of hashish seized at Sharon. No record was made of the oral statements made by Vallie at the time the

Ducharme search warrant was issued. Judge Bristow granted the applications and issued the warrants. The search of the Ducharme residence, pursuant to the warrant, was made in the early morning of May 17, but prior to 4:00 A.M.

Later the same morning the trunk of the Ducharme vehicle was forcibly opened and the vehicle searched at the Bethel barracks. Inventories were made and included in the officers' return of the warrants. The Ducharme search warrant, affidavits and returns were received in evidence as Government's Ex. 2.

At the time of the search and seizure at Sharon on May 16, 1979, a blue 1975 Ford pickup truck with camper cap attached, bearing Vermont license B6705, registered to Gary Butts, Box 251, Barre, Vermont, was parked in the vicinity of the garage. The vehicle was locked. In this condition it was moved to the Bethel state police barracks where it was held intact until May 23, 1979. On that date Trooper Roy Holton signed and submitted an application for a warrant to search the impounded Butts' vehicle, with supporting affidavit to the Honorable George Ellison, a judge of the Vermont District Court at Hartford. The applicant was sworn at the time he appeared before Judge Ellison and his oral representations were made under oath. The Holton affidavit states the results of the search of the Sharon premises on May 16–17, 1979. It also sets forth that the seizure of the vehicle was in accordance with advice given by Special Agent Theodore Handoga of the Drug Enforcement Administration. The Butts vehicle was searched on May 23, an inventory made of the articles found and the documents returned to the state district court as directed. Certified copies of these documents were received in evidence as Government's Ex. 3.

Two days later, on May 25, 1979, Corporal Robert Vallie appeared in person before the Honorable Ronald Kilburn, a Judge of the Vermont District Court at Rutland. Corporal Vallie presented a signed application to search the residence and curtilage of David A. and Marjorie Mullen Southham, known as the Temple Schoolhouse in Benson, Vermont. The application was supported by affidavits of Corporal Vallie and Trooper Holton that contained much of the substance of the information included in the affidavits submitted in the application for search of the Sharon location issued by Judge Bristow. It included various sightings of vehicles registered to David and Marjorie Southam at Sharon and the Ducharme residence in Quechee, surveillance conducted at Benson and the results of the arrests, search and seizure made at Sharon on May 16, 1979.

Corporal Vallie appeared before Judge Kilburn with Trooper Holton and John Liccardi, the State's Attorney for Rutland County. Officer Vallie was sworn before Judge Kilburn and his oral statements were recorded and later transcribed. The transcript was received in evidence on Government's Exhibit 12. On the strength of the affidavits and the oral statement, Judge Kilburn found probable cause for the issuance of the search of the Southam residence. The warrant was executed on the afternoon of May 29, 1979. The warrant and officer's return were received in evidence as Government's Ex. 4.

The papers submitted to Vermont State Judges Bristow, Ellison and Kilburn in support of the search warrants, Government's Exhibits 1, 2, 3 and 4, that were received in evidence, do not specify which of the observations made during the protracted surveillance at Sharon and Benson, were made with the aid of binoculars, spotting scopes or the Questar lens.

The police observations that penetrated the interior of the Sharon house, reported in the applications for search warrants, were confined to two occasions.

On April 24, 1979, police observed the passing of a cigarette and inhaling of some substance among persons sighted in the lighted kitchen. During the same observation, green plant material was observed through the window as it was held in a clear plastic bag.

On May 8, 1979, Corporal Miller testified he observed a male person, later identified as Ducharme, who had arrived at the Sharon house in a Ford LTD, sitting at a table in the kitchen, counting something with his fingers as if the count was made from a bundle, and writing something in a document.

### Reliability of Informants' Information

As pointed out above, the information supplied by the informant Schrager was confirmed generally by the surveillance conducted at Sharon and Benson. More particularly, the use of various pickup trucks with camper caps was frequently observed at Sharon and at Ducharme's residence in Quechee, including the vehicular equipment registered to Butts, Radzikowski and Southam. The vehicles registered to the various owners, identifiable as the persons disclosed by the informant, were observed at and traveling to and from the target locations. During the first week in May a truck was observed arriving at the Sharon parking area near the garage where boxes and smaller bundles were unloaded. The activities conducted at Sharon were consistent with a business enterprise involving the transport and storage of goods. This included the loading and unloading of boxes and their carriage to and from the house and garage.

Although the surveillance at the Southam residence in Benson was much less productive, some facts consistent with Schrager's disclosure were observed. This, coupled with Southam's involvement at the Bailey–Rawson investigation and the presence of the Southam truck and VW at Sharon, was sufficient to motivate the police to continue the surveillance and to request a search warrant after the search and arrests on May 16–17, 1979.

■ Upon consideration of the evidence presented during the course of the protracted pretrial suppression hearings, the court finds the facts presented by the state police in the affidavits and sworn oral testimony submitted in support of the application for the search warrants, Governments Exhibits 1, 2, 3 and 4, were believed by the state police officers to be true. The court further finds that none of the facts presented to the judicial officers who issued the warrants were deliberately falsified, fabricated nor recklessly made in disregard of the truth. The search warrants were issued on probable cause and proper findings by the state judicial officers to that effect.

### Prosecutorial Conduct

During the period 1975 to date there has been a continuous exchange of drug intelligence information between the Vermont State Police and the United States Drug Enforcement Administration. Cooperation between the state and federal enforcement agencies is longstanding and continuous.

Special Agent Handoga initiated investigation of David Lace and Roger Ducharme in late 1975. In this, as in other ongoing investigations, information was exchanged on a frequent basis, often weekly. Information concerning the identification of vehicles at Sharon and Quechee was provided by Vermont State Police in March 1979 and the Information was communicated to the D.E.A. Special Agent Handoga was informed of the continuous surveillance of the Sharon property soon after it was undertaken. Since police kept D.E.A. informed generally of the progress of the organized watch of the Sharon and Benson properties, there was no evidence that D.E.A. officers visited either site. Special Agent Handoga assisted the state police in procuring surveillance equipment. The state police informed him of the results of the search after it was conducted on May 16. Handoga advised state officers concerning federal procedures to secure the vehicles that were seized on May 16 and 17.

The state prosecutions were commenced immediately after the arrests made on those dates. Counsel for the Government and the defendants stipulated that if Michael Sheehan, State's Attorney for Windsor County, who instituted the state prosecutions, were called as a witness, he would testify that he conferred with the United States Attorney for the District of Vermont

on May 27, 1979. It was then decided that the State would eventually dismiss the prosecutions in favor of federal action against the defendants. The reasons dictating that decision were that federal government had greater jurisdictional power over witnesses and the federal penalties for the offenses charged were more severe. Problems of proof, avoidance of the liberal state rules for discovery of the State's evidence and more abundant federal financial resources were other factors leading to the State's relinquishment.

It was further agreed between the state and federal prosecuting officers to resist the defendants' request for discovery under the state procedures until federal prosecutions were begun. The resistance was not availing for the reason the state court granted defendants' discovery requests. Rather than comply with the discovery directives, the state prosecutor on July 31, 1979 dismissed the state criminal proceedings against the defendants charged in the state proceedings--David Lace, Roger Ducharme, Gary Butts and Patricia Eckman.

## CONCLUSIONS

*Standing*

██ Fourth Amendment analysis involves a two-step determination. First, the court must decide whether the defendant seeking to suppress evidence has an interest protected by the Fourth Amendment. If the court finds that a protected interest exists, it must then determine whether police conduct infringed upon that interest. The former determination has traditionally been categorized under the rubric of "standing." *E. g., Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). Recently, in *Rakas v. Illinois*, 439 U.S. 128, 139, 99 S.Ct. 421, 428, 58 L.Ed.2d 387 (1978), the Court declared use of the term "standing" to be somewhat misleading. The Court found that the "standing" determination "is more properly subsumed under substantive Fourth Amendment doctrine." *Id.* Thus, the vital question is "whether the disputed search and seizure has infringed an interest of the defendant

which the Fourth Amendment was designed to protect." *Id.* at 140, 99 S.Ct. at 429.

██ In this case the defendants have all adopted the suppression motions of their co-defendants. That does not relieve them of the obligation to establish their individual interest in the evidence sought to be suppressed. A defendant seeking to suppress evidence seized by the police has the burden of demonstrating that his own Fourth Amendment rights were violated. *Rakas v. Illinois, supra*, 439 U.S. at 131 n.1, 99 S.Ct. at 423 n.1. "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174, 89 S.Ct. 961, 966, 22 L.Ed.2d 176 (1969). The defendants may not seek to suppress evidence seized in violation of co-defendants' Fourth Amendment rights. *Id.* at 172, 89 S.Ct. at 965. Evidence suppressible as to one co-defendant can be admitted as to the remaining defendants, if they have no personal Fourth Amendment claim. *Id.* at 173 n.7, 89 S.Ct. at 966 n.7; *Wong Sun v. United States*, 371 U.S. 471, 491–92, 83 S.Ct. 407, 419, 9 L.Ed.2d 441 (1963); *United States v. Re*, 372 F.2d 641 (2d Cir. 1967).

Prior to the *Rakas* decision, "anyone legitimately on premises where a search occurs could challenge its validity." *Jones v. United States, supra*, 362 U.S. at 267, 80 S.Ct. at 734. In *Rakas* the Court rejected the full sweep of *Jones* to apply the guidance provided in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The new test asks "whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois, supra*, 439 U.S. at 143, 99 S.Ct. at 430.

Recent cases indicate that the *Rakas* test governs all Fourth Amendment cases. The *Jones* decision created a "standing" exception for persons charged with possessory offenses. Such persons were excused from demonstrating an interest in any contraband seized or places searched. *Jones v. United States, supra*, 362 U.S. at 263, 80

S.Ct. at 732. The Court formally overruled the *Jones* automatic standing rule in *United States v. Salvucci*, —— U.S. ——, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980) and *Rawlings v. Kentucky*, —— U.S. ——, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). After eliminating automatic standing, the Court applied the *Rakas* legitimate expectation of privacy doctrine.

In the case before the court, defendants challenge at least eight separate search and seizures of evidence. The court is called upon to examine each of these searches separately, because each involves different privacy interests on the part of the various defendants. The searches can be categorized as follows:

1. Surveillance of the Sharon property
2. Search of the Sharon buildings
3. Search of Ducharme's house in Quechee
4. Search of Ducharme's 1975 Ford automobile
5. Search of David Lace's 1978 Mercury automobile
6. Search of Eckman's handbag
7. Surveillance of the Temple Schoolhouse
8. Search of the Temple Schoolhouse.

*Surveillance of the Sharon Property*

Defendants contend that the warrantless, telescopic surveillance of the Sharon property constituted an illegal search and seizure of evidence. Defendants further contend that the surveillance evidence seized formed the basis for the probable cause determination in all subsequent search warrants. Thus, under a fruits–of–the–poisonous–tree theory, they seek to suppress virtually all the evidence seized by the police in this case, including the surveillance itself.

■ To suppress the fruits of police use of illegally seized evidence, a defendant must show that he personally suffered a Fourth Amendment violation in the original seizure. *See Wong Sun v. United States, supra*, 371 U.S. at 491–92, 83 S.Ct. at 419; *United States v. Agapito*, 620 F.2d 324, 335 (2d Cir. 1980). Any defendant who fails to establish a personal expectation of privacy

that was violated by the Sharon surveillance cannot challenge subsequent police use of the information so gathered.

The *Rakas* court employed several different factors as indicia of an impermissible intrusion. Among these factors are whether defendant has a property or possessory interest in the place searched, and whether defendant could and did exclude others from intruding. *Rakas v. Illinois, supra*, 439 U.S. at 148–49, 99 S.Ct. at 432–433. In applying these factors, the Court recognized that a defendant could have a privacy interest in a place other than his home. *Id.* at 142, 99 S.Ct. at 429. Moreover, the Court adopted the teaching in *Katz* that the key to Fourth Amendment analysis is the person injured, rather than the place searched. *Id.* at 143, 99 S.Ct. at 430. The Court rejected any notion that the existence of a common law trespass by the police is determinative of whether a violation of the Amendment has occurred.

■ The question of whether the state troopers trespassed on the Sharon property does not determine the issue under consideration here. Rather, the court must consider whether each defendant, individually, could legitimately expect to be free from observation while on the Sharon property.

Defendant Butts, as lessee of the premises, had the greatest expectation of privacy. Nevertheless, testimony at the hearing indicated that the owners of the property shared the use of the grounds and one of the barns with Butts. The land was not posted. Outsiders could enter the open property at will. Therefore, Butts' actions outside the buildings could easily be observed by any person going on the land.

■ Police observation of events occurring inside the house on April 24 poses a different question. Regardless of the standard applied, courts have uniformly held that a person has a Fourth Amendment interest in freedom from covert surveillance in his own home. In *Alderman v. United States, supra*, 394 U.S. at 176, 89 S.Ct. at 968, the Court held that an individual may object to electronic surveillance of conver-

sations in his own home, even though he was not a party to those conversations. Recent opinions apply the rationale of the electronic eavesdropping cases to cases of police observation by means of powerful telescopic devices. *See, e. g., United States v. Taborda,* 491 F.Supp. 50 (E.D.N.Y.1980), 635 F.2d 131 (2d Cir. 1980). Thus, Butts may object to the optically aided surveillance of the interior of the Sharon property on April 24, regardless of whose activities were observed.

■ If Butts has no legitimate expectation of privacy from observation of activities outside the four walls of the house, then *a fortiori* the other defendants have no such interest. The other defendants had no property interest in the grounds, and less authority than Butts to exclude others from the area.

Defendant David Lace asserts a "standing" claim based on the Government's allegation that "Lace with others would rent all of the 'stash houses' as well as having true ownership of all of the vehicles involved." This claim is, in essence, a claim of automatic standing under *Jones v. United States, supra,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697, based as it is on the Government's allegations of possession of the places searched. Since *Salvucci* and *Rawlings* (see discussion *supra*) overruled the *Jones* automatic standing theory, this claim is untenable. Defendants must resort to their claims that are based on the *Rakas* standard. They have extensively briefed and argued the question of legitimate expectation of privacy.

■ Defendants David Lace, Ducharme, Butts, and Eckman were observed in the interior of the Sharon house. The remaining question about the surveillance is whether any of these defendants, other than Butts, had a legitimate expectation of privacy in the interior of the house. "[A] 'legitimate' expectation of privacy by definition means more than a subjective expectation of not being discovered." *Rakas v. Illinois, supra,* 439 U.S. at 143, n.12, 99 S.Ct.

at 430, n.12. "[P]eople may demand privacy unless a policeman can see or hear them from a place accessible to those members of the public not preternaturally inquisitive." *United States v. Taborda, supra,* 491 F.Supp. at 53. Considering all the circumstances at the time the interior surveillance was done, the court concludes that a reasonable person could expect to avoid observation during his presence in the kitchen of the Sharon house. Consequently, Butts, David Lace, Ducharme, and Eckman may challenge the surveillance of the interior of the Sharon house.

*Search of Sharon Property, Ducharme Residence, and Ducharme Vehicle*

■ The defendants' chief complaint about the May 16 search of the Sharon property, and the searches of Ducharme's house and car, is that the warrants obtained for the searches were based upon unlawful surveillance at Sharon. Since Butts, David Lace, Ducharme, and Eckman may challenge the interior surveillance, they may also attack a subsequent search if the product of the illegal surveillance was an essential ingredient to the determination of probable cause upon which the warrants issued.

■ Butts was present at the Sharon property during the May 16 search. As lessee of the house and grounds, he had a property interest and the ability to exclude others. Hence, Butts can challenge a physical search of the property. By contrast, none of the other defendants were present during the May 16 raid. None have demonstrated such a legitimate expectation of privacy at the time the Sharon search was conducted to afford an independent basis to support the separate Fourth Amendment claims. *See, e. g., United States v. Salvucci, supra,* —— U.S. ——, 100 S.Ct. 2547, 65 L.Ed.2d 619; *Rawlings v. Kentucky, supra,* —— U.S. ——, 100 S.Ct. 2556, 65 L.Ed.2d 633. Only Butts may challenge the Sharon search on grounds other than the surveillance.

■ Little evidence was presented at the hearing regarding the search of Duc-

harme's house in Quechee. In any case the evidence is to the effect that Ducharme is the owner of the house. The only person with a colorable direct challenge to the search is Ducharme.

The search of Ducharme's car presents a different question. The car was in the possession of Eckman at the time the police seized it. Ducharme was not present. A recent case in this circuit construing *Rakas* denied standing to both the absent owner and the present driver, absent any showing of proprietary interest in the briefcase that was seized. *United States v. McGrath*, 613 F.2d 361 (2d Cir. 1979).

▮ Neither of the defendants, Ducharme nor Eckman, presented evidence related to their interest in the property seized in the search of the Ford LTD. Nonetheless, the court will consider their Fourth Amendment claims on the strength of Eckman's custody and control as the operator of the vehicle. *See United States v. Ochs*, 595 F.2d 1247 (2d Cir. 1979) *cert. denied* 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1980). Since *Rakas*, however, Ducharme's ownership alone is not sufficient to establish a reasonable expectation of privacy in the contents of the vehicle. *Rakas v. Illinois, supra*, 439 U.S. at 148–49, 99 S.Ct. at 432–433. Ownership remains a factor to be considered. In any event, the court will proceed to consider the claims advanced by Eckman and Ducharme as they relate to the search of the Ford registered to Ducharme and operated by Ms. Eckman.

### Search of David Lace's Vehicle

▮ Apparently, David Lace, as owner and operator of the 1978 Mercury vehicle at the time of its seizure, may challenge the subsequent search at the Bethel barracks. Ducharme, a passenger in the vehicle, also asserts an independent right to challenge the search. Ducharme is in the posture of a passenger within the concept of the *Rakas* case. The Court held that passengers had no legitimate expectation of privacy as to items seized from the car. Consequently, no defendant, other than David Lace, has demonstrated the independent capacity to

challenge the validity of his consent to search his vehicle.

### Search of Eckman's Handbag

It is not clear that the Government has challenged the defendants' right to question the search of Eckman's handbag. Nevertheless, the court must decide which parties should benefit from suppression of the evidence obtained from the search, should such suppression be necessary.

▮ *Rawlings v. Kentucky, supra,* —— U.S. ——, 100 S.Ct. 2556, 65 L.Ed.2d 633, governs this question. A defendant has no legitimate expectation of privacy in the handbag of a third person, even if he owns some of the objects in that handbag. *Id.* Consequently, only Eckman can directly challenge the search of her handbag.

### Surveillance and Search of Temple Schoolhouse

No evidence was presented for the purpose of proving defendants' privacy interest in the Temple Schoolhouse. The court is therefore constrained to limit the right to challenge the search to Southam, the owner and occupant of that building.

### Lace's Custodial Statements

▮ The privilege against self–incrimination is purely a personal right. *Bellis v. United States*, 417 U.S. 85, 89–90, 94 S.Ct. 2179, 2184, 40 L.Ed.2d 678 (1974); *Couch v. United States*, 409 U.S. 322, 327–28, 93 S.Ct. 611, 615, 34 L.Ed.2d 548 (1973). Only David Lace may object to the admissibility of statements made to the police following his arrest.

### Surveillance by Optical Instruments
### 1. Interior of House

▮ Defendants Butts, David Lace, Ducharme, and Eckman had an expectation of privacy when they were observed by the police in the interior of the Sharon house. Given this finding, the court must next decide whether the police observation invaded that privacy.

The test determining whether the evidence gathered during the surveillance at Sharon offends the Fourth Amendment is: "first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *United States v. Agapito,* 620 F.2d 324, 329 (2d Cir. 1980) (quoting *Katz v. United States, supra,* 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring)).

Justice Harlan went on to point out:

Thus a man's home is for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the "plain view" of outsiders are not "protected" because no intention to keep them to himself has been exhibited. On the other hand, conversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable. Cf. *Hester v. United States,* supra [265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898].

*Id.*

Since Butts purported to occupy the Sharon farmhouse as a residence, he and his visitors were entitled to legitimately expect privacy during the time his or her activities were under observation by multi–powered optical instruments. *E. g., Rakas v. Illinois, supra,* 439 U.S. at 149, 99 S.Ct. at 433.

The activities of these persons in the Butts' kitchen were not exposed to plain view without the aid of multi–powered lenses.

■ The Government contends that the police observation did not constitute a seizure for which a warrant was required since the observations were made through unshuttered windows. The troopers could only obtain a detailed view of the interior of the house by use of powered optical instruments. Such surveillance intrudes more heavily than unaided observation from the same vantage point. Indeed, the optical magnification provided an invasion somewhat comparable to the warrantless electronic eavesdropping outlawed in *Katz v. United States, supra,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576. If the conversation could be "seized" in *Katz,* the view could be "seized" here. See *United States v. Taborda, supra,* 491 F.Supp. at 51–52; *United States v. Kim,* 415 F.Supp. 1252 (D.Haw.1976). Consequently, the court concludes that the troopers' mechanically aided observation of the interior of the Sharon kitchen constituted a seizure. In light of this finding, the court will order that the particular activities of the defendants Butts, David Lace, Ducharme, and Eckman, observed in the kitchen of the Sharon property be suppressed.

*2. Exterior of House*

The surveillance of activities outside the house presents a different question. As referred to above, none of the defendants had a legitimate expectation of privacy in the open area at Sharon. Hence, the manner in which the police surveillance of outdoor activities was conducted is irrelevant to the suppression of this evidence.

■ Defendants apparently suggest that the *Kim* and *Taborda* cases bar all uses of instrument observation data obtained by the police, including the activities of defendants occurring outdoors. *Kim* and *Taborda* were concerned with powered observations into an individual's home, principally the interior and connected area. These cases do not stand for the proposition that all mechanically aided surveillance is illegal per se. Surveillance by use of powerful telescopic devices does not automatically create a legitimate expectation of privacy for the defendants wherever they may have been seen. *See e. g., United States v. Minton,* 488 F.2d 37 (4th Cir. 1973); *United States v. Grimes,* 426 F.2d 706 (5th Cir. 1970).

■ There is a marked difference between observation of the exterior from views which penetrate the interior of a building. The defendants could not reasonably expect to shield their outdoor activities from the view of persons not associated with their enterprise. It matters not whether the police used binoculars and tele-

scopes to view these activities. The combined motions to suppress the observations of defendants' activities occurring outside the dwelling houses are denied. *See Rakas v. Illinois, supra,* 439 U.S. at 143, 99 S.Ct. at 480; *United States v. Arboleda,* 633 F.2d 985 (2d Cir. 1980).

### 3. *Curtilage*

The defendants are not aided by invocation of what Judge Friendly has characterized as "the hoary concept of 'curtilage.'"

> Terming a particular area curtilage expresses a conclusion; it does not advance Fourth Amendment analysis. The relevant question is . . . whether the defendant has a legitimate expectation of privacy in the area.

*Id.* 633 F.2d at 992.

### *Search Warrants*

■ The grant of the motion to suppress the results of the observation of activities of the defendants Butts, David Lace, Roger Ducharme and Patricia Eckman in the kitchen of the Sharon house does not affect the validity of the search warrants issued thereafter by District Judges Bristow, Kilburn and Ellison.

> (T)he reviewing court may consider *only* information brought to the magistrate's attention.

*Aguilar v. Texas,* 378 U.S. 108, 109, footnote 1, 84 S.Ct. 1509, 1511, footnote 1, 12 L.Ed.2d 723 (1964); *United States v. Menser,* 360 F.2d 199, 203 (2d Cir. 1966).

It is the officer's affidavit, rather than the evidence presented at the hearing, which controls. *United States v. Taborda, supra.* Unlike the affidavit in *Taborda* here there was no reference to the use of high–powered optical instruments in the interior surveillance at Sharon. In *Taborda,* "so far as the affidavit reveals, every fact critical to a showing of probable cause might have been observed exclusively through the telescope." And apparently all of the observations made were directed to the interior of the premises occupied by the defendant. *Id.*

■ Such is not the case at hand. There remains the question of whether the purging of the officers' affidavits of the interior penetration of the Butts' kitchen affords adequate residual support for judicial determination of probable cause. The court holds there was ample ground for issuing the search warrants without consideration of the interior surveillance of the Butts place. *See United States v. Pond,* 523 F.2d 210, 214 (2d Cir. 1975), *cert. denied,* 423 U.S. 1058, 96 S.Ct. 794, 46 L.Ed.2d 649 (1976).

### *Sharon Property*

The heart of probable cause for the warrant to search the Beaver Brook Road property issued by Judge Bristow is the information supplied to the state police by the informant Kenneth Schrager. That is not to say that the existence of probable cause stands on the basis of the information derived only from Schrager. To the contrary, there are a variety of facts derived from other sources. Since the Schrager information prompted the intensive investigation which culminated in the challenged search, it is appropriate to consider this aspect of the affidavits of state police officers Vallie and Holton, upon which the search warrant issued.

■ The judgment of a disinterested judicial officer in the determination of probable cause is entitled to great deference in the court where the decision is challenged. *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969). In *Spinelli* the court enlarged upon the standards previously articulated in *Aguilar v. Texas, supra,* 378 U.S. at 108, 84 S.Ct. at 1511 (1964), to be applied in assessing the reliability of information derived from a confidential informant in determining probable cause. In *Aguilar* the application was held to be inadequate for two reasons. It failed to state the underlying circumstances necessary to enable the judicial officer to judge the validity of the informant's conclusion that the narcotics were at the location he disclosed. Secondly, the affidavit of the police officers failed to support their asser-

tion that the informant was credible or his information reliable. *Id.* at 114, 84 S.Ct. at 1513.

*Spinelli* imposed the requirement that the source of the informer's information be disclosed; whether directly derived from personal observation or indirectly obtained from other sources whose reliability is explained.

The court concludes that the affidavit presented in support of the warrant to search the Sharon location meets the demands of *Aguilar* and *Spinelli.* The source of the informant's information was his personal trafficking with members of the suspect organization since 1975. Schrager further informed that he had purchased 500 pounds of Columbian marijuana from the Sharon location within the three months preceding his disclosure. He described the location of the premises in detail with adequate direction to enable the officers to proceed to the location without other guidance. The extent of the operation was confirmed by intelligence sources in the Drug Enforcement Administration.

 The reliability of the information provided by Schrager is established in the affidavits submitted to Judge Bristow. It was based on personal observations and dealings with the Lace–Ducharme group. Personal observation provides a reliable basis for judicial action on the strength of the informer's disclosure. *Spinelli v. United States, supra,* 393 U.S. at 416, 89 S.Ct. at 589; *United States v. Rollins,* 522 F.2d 160, 164 (2d Cir. 1975) *cert. denied* 424 U.S. 918, 96 S.Ct. 1122, 47 L.Ed.2d 324 (1976); *United States v. Viggiano,* 433 F.2d 716, 719 (2d Cir. 1970) *cert. denied* 401 U.S. 938, 91 S.Ct. 934, 28 L.Ed.2d 219 (1971).

The information which the Vermont state police gained from Schrager provided identification of several persons and particular types of motor vehicles engaged in the alleged unlawful activity reported by the informer. The location of the premises that were the target of the warrant applications was described in sufficient detail to enable easy access to the premises and early identification of their visitors. Relatively similar detail was held sufficiently reliable to show probable cause for the arrest in *Draper v. United States,* 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959). *Draper* was cited a "suitable benchmark" in *Spinelli, supra,* 393 U.S. at 416, 89 S.Ct. at 589. It is significant that many of the details were confirmed by subsequent observations made by the police during the course of the extensive surveillance of vehicles and persons at the subject premises.

To be sure, much of the corroboration achieved by the surveillance concerned activity that was not unlawful.

> The corroborating evidence need not, of course, establish the crime itself; corroboration of even innocent elements is enough.

*United States v. Gonzalez,* 555 F.2d 308, 313 (2d Cir. 1977).

An additional factor in support of Schrager's credibility resides in this informer's professed participation in the criminal conduct about which he informed.

> Common sense in the important daily affairs of life would induce a prudent and disinterested observer to credit these statements. People do not lightly admit a crime and place critical evidence in the hands of the police in the form of their own admissions. Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility–sufficient at least to support a finding of probable cause to search. That the informant may be paid or promised a "break" does not eliminate the residual risk and opprobrium of having admitted criminal conduct. Concededly admissions of crime do not always lend credibility to contemporaneous or later accusations of another. But here the informant's admission that over a long period and currently he had been buying illicit liquor on certain premises, itself and without more, implicated that property and furnished probable cause to search.

*United States v. Harris,* 403 U.S. 573, 583–84, 91 S.Ct. 2075, 2081–82, 29 L.Ed.2d 723 (1971).

The affidavits submitted to Judge Bristow in support of the application for a warrant to search the Sharon property considered in their entirety were sufficient to support the determination of probable cause and the issuance of the warrant.

### The Ducharme Residence and Ford LTD Vehicle

After the warrant to search the Sharon property was executed, the affidavit of Corporal Vallie, submitted in support of the application to search Sharon, was repeated and enlarged to obtain warrants to search the Ducharme residence in Quechee, Vermont and the Ford LTD, Vermont license No. 3326K, registered to Ducharme.

The affidavit includes a report of surveillance of the Ducharme residence which resulted in observation of the LTD previously loaded at Sharon in the driveway at Quechee after traveling from Sharon.

The affidavit states the affiant personally observed the discovery of large quantities of regulated drugs packaged in multi–hundred pound quantities identical to those previously "observed by surveillance officers being loaded into several vehicles at the (Sharon) residence, including Vermont # 3326K on 5/15/79." Gov. Ex. 2.

■ The reliable and credible facts which support the determination of probable cause and issuance of the warrant to search the Butts residence at Sharon are supplemented by the subsequent observation of Ducharme and his motor vehicle later in the evening of May 15, 1980 at Sharon and Quechee. These facts, coupled with the sworn report of nature and extent of the substances seized during the execution of the Sharon warrant, clearly establish probable cause sufficient to justify the issuance of the warrants to search the Ducharme residence and the motor vehicle registered in his name.

### The Butts Vehicle

■ As reported in the findings above, on May 23, 1979, Trooper Roy Holton applied to the Honorable George F. Ellison, Judge of the Vermont District Court, Wind-

sor Circuit, for a warrant to search the 1975 Ford truck with camper cap, registered to the defendant Gary Butts, Box 251, Barre, Vermont. The supporting affidavit reports that the vehicle was seized on May 16, 1979, upon being found in the parking area of the Sharon property. The affidavit reports the results of the search at Sharon and seizure of substantial quantities of hashish and marijuana with various records related to drug traffic. The officer's affidavit reports the Sharon residence was supposedly rented to Butts. It further states the truck was observed at the Sharon property during the surveillance. It also indicates that Special Agent Handoga advised federal seizure was in the process of completion. It states that Butts was arrested at the Sharon residence at the time of the search. The warrant was issued, executed and an inventory of the results of the search returned to court. This court concludes that the papers submitted to Judge Ellison adequately support the finding of probable cause and the Judge's decision to issue the warrant on May 23, 1979.

### The Southam Warrant

On May 25, 1979 Corporal Vallie and Trooper Holton, accompanied by John S. Liccardi, State's Attorney for Rutland County, appeared before the Honorable Ronald F. Kilburn to submit a request for a warrant to search the property occupied as the residence of David A. Southam and Marjorie Mullen Southam at Benson. The application was made in writing and was supported by affidavits of the officers which contained many of the facts submitted in support of the initial search warrant, including substantially all the prior references to the defendant Southam as they relate to the Bailey–Rawson investigation. Further reference is made to information supplied by a second confidential informant whose reliability is explained.

The affidavits also included information supplied by Schrager which identified Southam as being known as "Lobsterman," the Southam telephone number at Benson and the vehicle registered to David and Marjo-

rie Southam. Police observation of these vehicles at Sharon, the Ducharme residence and at Benson was reported.

The affidavits supplement the information submitted in support of Government's Exhibit 1 by the including the results of the searches at Sharon and the seizure of narcotics and records which refer to "Lobsterman."

Judge Kilburn, prior to issuing the warrants, caused both police officers to be sworn and their oral representations to the judge were made under oath and stenographically reported. Government's Ex. 12. It developed at the suppression hearing that some of the discussion between the state police officers and Judge Kilburn was not recorded, nor included in the state court record. Southam presses the point that the evidence taken in the search of his property must be suppressed for the reasons: first, the officers failed to file a transcript of the sworn testimony before the judicial officer; second, a portion of the discussion was not recorded.

It is urged that these shortages demonstrate a violation of Fed.R.Crim.P. 41(c) and its state counterpart, Rule 41 of the Vermont Rules of Criminal Procedure, and require that the warrants be vitiated.

 The prosecution, whether it be state or federal, cannot bolster the affidavit upon which the search warrant issued by resort to unsworn and unrecorded discussions between the police and the judge. *United States v. Sellers*, 520 F.2d 1281, 1282 (n.1) (4th Cir. 1975); *State v. Rocheleau*, 131 Vt. 563, 313 A.2d 33. In the presence of non–compliance with Rule 41, the recorded affidavit must be sufficient unto itself; otherwise the evidence must be suppressed. *See United States v. Hittle*, 575 F.2d 799, 801 (10th Cir. 1978). But that is not to say that where the affidavit included in the record forms an adequate basis for the probable cause determination, the evidence will be suppressed. To the contrary, the search will be sustained. *United States v. Sellers, supra.*

 Here the warrants were issued under the authority of the State of Vermont. The affidavit in support of the search of the Southam property meets the constitutional demands of probable cause. The departure from the specific directives of the applicable state and federal rules of procedure does not justify suppression of the products of the search. *See United States v. Harrington*, 504 F.2d 130, 134 (7th Cir. 1974).

Lastly, the defendant Southam challenges the search of the real and personal property at Benson on the ground that the police failed to disclose to Judge Kilburn that Temple Schoolhouse had been under a continuous surveillance and the 24–hour surveillance failed to confirm facts reported by the informant Schrager. A former state police officer, Stanley Strusinski, participated in surveillance of the Sharon property on May 4, 1979 and had observed the Southam premises in Benson on one occasion. He observed a vehicle, registered to Marjorie Southam, arrive at Sharon, occupied by a male and female who were met by two males at the farmhouse. He reported the persons were observed to leave the premises for 45 minutes and then return. Officer Strusinski testified that during his surveillance he didn't notice any activity which he "would describe as being consistent with major criminal drug distribution." Other state police officers, who were engaged from time to time in the Benson surveillance, identified certain traffic and motor vehicle identification at Sharon and Benson, but all confirmed that they made no observation which they could specifically identify as drug related criminal activity. Southam's counsel presses the point that the failure of Officers Vallie and Holton to report the negative results of the Benson observation misled Judge Kilburn by concealment of exculpatory facts which, if known, would have precluded the issuance of the warrant.

 The court recognizes that deceptive concealment may and should be proscribed as a basis for probable cause. *See, e. g., United States v. Lefkowitz*, 464 F.Supp. 227 (C.D.Cal.1979). But the omis-

sions complained of here, and that shown in *Lefkowitz*, were insufficient to undermine the finding of probable cause by the neutral judicial officer. There has been no proof that the information was deliberately withheld for the purpose of deception; nor was it recklessly done for an untruthful purpose. The court is not persuaded by the evidence advanced by Southam that there was any false statement by Officers Vallie and Holton intentionally and knowingly withheld in reckless disregard of the truth within the precept of *Franks v. Delaware*, 438 U.S. 154, 155, 98 S.Ct. 2674, 2677, 57 L.Ed.2d 667 (1978). Had the omitted material, of which the defendant complains, been included in the police affidavit or their sworn oral statements, it would not have undermined or precluded the determination of probable cause upon which the warrant issued.

### Timeliness of the Warrants

■ It is not open to question that the facts presented to the state judicial officers who issued the warrants cover extended periods of time. Proof of the facts to support probable cause must be so related to the time of the issue to justify a finding of probable cause at that time. *Sgro v. United States*, 287 U.S. 206, 210, 53 S.Ct. 138, 140, 77 L.Ed. 260 (1932).

The thrust of the charges presented in the indictment is extended and extensive illegal traffic in controlled substances. The information supplied by Schrager verified facts disclosed in an earlier police investigation that faltered when the agents' identities became known. The informant's information was fresh as of the time of his arrest in March 1979 when the organized surveillance was undertaken. The specifics of his report were confirmed and made current down to the date when the application for the Sharon warrant was submitted to Judge Bristow on May 15, 1979. The affidavits on which the subsequent warrants were procured were refreshened by the results of the search and subsequent arrests during the night of May 16–17. The subsequent investigation by the state police, following Schrager's disclosure constituted

recent confirmation of the reliability of the informant's information.

■ Looking at the full spectrum of the facts presented and the time span during which the facts were gathered, the court concludes that the warrants were based on probable cause to search the subject properties at the time the warrants issued. *United States v. McGrath*, 622 F.2d 36, 42 (2d Cir. 1980); *United States v. Hyde*, 574 F.2d 856, 863 (5th Cir. 1978). This result is not impaired by the fact that the Sharon affidavit was the keystone for searches at other locations. *United States v. DiMuro*, 540 F.2d 503, 516 (1st Cir. 1976) *cert. denied* 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977).

### The Arrest of Patricia Eckman

The Supreme Court has recently held

(E)xcept in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment.

*Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (1979).

The question here is not related to a routine traffic stop nor a border check. The issue is whether Corporal Fields had an articulable and reasonable suspicion that Ms. Eckman, as the operator of the Ducharme Ford LTD, was engaged in unlawful activity sufficient to justify halting her travel on the public way.

Prior to the stop of the Ducharme vehicle, Officer Fields had attended a series of meetings concerning the police action that was planned and anticipated to take place during the night of May 16, 1979. The officer was assigned to maintain a watch at the Ducharme residence in Quechee for any movement of the motor vehicles registered to Ducharme. When the Ducharme vehicle left the premises and was followed by

Fields shortly before 1:00 A.M., the officer received a radio transmission to stop the car and obtain identification of the operator and occupant. At that point in time the officer knew the search at Sharon had been conducted and its results known. He had valid reason to suspect and believe that the vehicle was occupied by Ducharme.

■ When the identity of the operator was established, Corporal Fields radioed to report the driver's identity. He was then instructed to arrest Ms. Eckman. At that time there was clearly probable cause to arrest the defendant Eckman based on the information contained in Corporal Vallie's affidavit for the warrant to search the Sharon property, coupled with the results of the search undertaken earlier that same night.

■ Following Fields' communication with Corporal Vallie at the moment the arrest was made, the officers had probable cause to make it on the strength of "facts and circumstances within their knowledge and of which they had reasonably trustworthy information ... sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); *United States ex rel. Wilson v. LaVallee,* 367 F.2d· 351, 352 (2d Cir. 1966). The requirements of probable cause are satisfied since the officer who ordered the arrest had adequate knowledge to support a finding of probable cause. *United States v. Loundmannz,* 472 F.2d 1370, 1379 (D.C.Cir.1972). Since the arrest of Ms. Eckman was constitutionally permissible, the impoundment of the vehicle and the immobilization of the Ford LTD to await the procurement of a warrant to search the vehicles were legally justified. *E. g. Chambers v. Maroney,* 399 U.S. 42, 52, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970).

■ The subsequent search of Ms. Eckman's handbag at Bethel after her arrest in Quechee Village stands differently. The search of her handbag at the police barracks cannot be justified as an incident of her arrest, nor under the automobile exception. *United States v. Chadwick,* 433 U.S. 1, 15, 97 S.Ct. 2476, 2485, 53 L.Ed.2d 538 (1977); *Chambers v. Maroney, supra,* 399 U.S. at 47, 90 S.Ct. at 1979; *Preston v. United States,* 376 U.S. 364, 367, 84 S.Ct. 881, 883, 11 L.Ed.2d 777 (1964). Any evidence seized from this source must be suppressed in the prosecution of Ms. Eckman. However, as noted above, since she alone had any expectation of privacy in her personal handbag, the order of suppression operates only as to her interest. *See Rawlings v. Kentucky, supra,* —— U.S. ——, 100 S.Ct. 2556, 65 L.Ed.2d 633.

*Statements of David Lace and the Consent to Search his Vehicle*

Soon after David Lace was arrested he was fully informed and understood his right to remain silent and his right to an attorney. The evidence on whether Lace requested to call an attorney during his detention at Sharon is in sharp conflict. Lace testified permission was deferred by the police until after he had been processed at Bethel. If such was the case, postponement of the grant of the request until after the Sharon premises were secured by the police is understandable and reasonable.

Lace's testimony concerning the renewal of the request is contradictory. David Lace testified on cross–examination that he "didn't really talk to any of them (police officers)" prior to his written consent to search his car, except the officer who processed him and that was for the purpose of giving his name and height and asking him to make a phone call. Later the witness testified that Officer Ruggiero tried to question him at both Sharon and Bethel, but he turned him down at both occasions. In any event, there is no evidence of express questioning of this defendant at either location "on the part of the police officers that they should have known were reasonably likely to elicit an incriminating response." *See Rhode Island v. Innis,* 446 U.S. 291, 302, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297 (1980).

The defendant David Lace was asked if he would consent to the search of his automobile and later if he would cooperate.

The defendant's response to the first question is found in his written consent. The answer was not in response to police interrogation; it was a practical accommodation to a consequence that the witness understood would be inevitable, by way of a search warrant in the event his consent was withheld. The defendant sought some advantage in his choice by imposing the condition that the property uncovered would not be considered to be his. The consent was given with full understanding of the right to counsel.

The inquiry by the police was primarily confined to the defendant's willingness to cooperate. The answer was in the negative as far as the State of Vermont was concerned. The defendant did not choose to let his reply end there. His added comment that he couldn't help the state, but that he had the capability of providing information useful to the federal government was unsolicited and voluntary.

■ After the search of the car was completed, Corporal LeClair inquired of David Lace about the cash found in the vehicle. Lace denied any knowledge of how the money came to be in his car. However, since his answer was elicited by a police inquiry, without any express waiver of *Miranda* rights, the response must be suppressed.

■ In sum, the movant is a mature and well informed person who, aside from his initial fright at time of apprehension, conveyed the impression of being self–possessed and self–confident despite his predicament. There is no persuasive evidence of police overbearing, deprivation of physical needs nor deception. Although the defendant was in custody, the totality of the circumstances are such that the court concludes the consent to search the motor vehicle was voluntarily given. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248, 93 S.Ct. 2041, 2058, 36 L.Ed.2d 854 (1973); *United States v. Price*, 559 F.2d 494, 503 (2d Cir. 1979).

The statement made concerning the movant's capability to render productive cooperation to federal authorities was voluntarily given in explanation of his refusal to cooperate with the state. It was made with full knowledge of his right to remain silent and his right to assistance of counsel. With the single exception noted above, the court concludes there was no trenchment on his constitutional rights protected under the Fifth and Sixth Amendments within the precepts of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *E. g. Rhode Island v. Innis, supra; Michigan v. Mosely*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).

### Prosecutorial Conduct

■ Fundamental concepts of federalism and the administration of criminal justice under our dual sovereignty system make it "desirable that the federal government be kept apprised of state prosecutorial developments in order to assess the situation and take the necessary steps adequately to enforce the federal laws and protect the public." *United States v. Mejias*, 552 F.2d 435, 441 (2d Cir. 1977). Similarly, the interest of the states are promoted by the free exchange of criminal intelligence by the federal enforcement agencies.

The prosecutorial conduct, of which several of the defendants complain, is founded principally on the joint participation by the drug enforcement officers at both state and federal levels. It is not commendable that state prosecutor undertook to frustrate the Vermont rules of discovery by dismissal of the state actions to await federal grand jury action. There is no indication that the defendants interposed any objection to the dismissal of the state prosecutions. And, of course, the result was that the defendants in the state proceedings were spared the problem of defending against prosecutions by both sovereigns.

Moreover, since the liberal rules of discovery in the courts of Vermont exceed the permissible limits of disclosure in the federal domain, it was consistent with the feder-

al interests involved to keep discovery efforts within the bounds of applicable federal law.

■ In determining whether the defendants have been harmed by the course taken, the court must apply the federal law, unaffected by what the state court may have countenanced or disapproved. *See Elkins v. United States*, 364 U.S. 206, 224, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669 (1960).

■ In any event, no facts or circumstances have been presented to establish misconduct by state or federal enforcement officers. Even had such a showing been made, apart from pre–indictment delay previously considered in the memorandum of decision filed September 15, 1980, the court has found no authority, and the defendants have not referred to any to support their claims for dismissal on this ground.

*Motions to Sever*

Every defendant has moved to sever his trial under Rule 14, Fed.R.Crim.P., either directly or by adoption of co–defendants' motions. Most of the motions to sever are based on the same two grounds. First, defendants contend that in a separate trial, co–defendants will be able to testify without compromising their Fifth Amendment self–incrimination protection. Second, defendants predict that the introduction of co–defendants' out–of–court statements will prejudice their Sixth Amendment confrontation rights.

The court has already passed upon defendants' first claim. In an order dated January 16, 1980, the court denied a severance to defendant Eckman. The court found that there was no assurance that co–defendants would provide exculpatory testimony in separate trials. *United States v. Smolar*, 557 F.2d 13, 21 (1st Cir. 1977). Similarly, the remaining defendants have failed to demonstrate that their co–defendants will testify if severance is granted, and there is no indication that the projected testimony would be exculpatory.

To establish a claim under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), a defendant must show that a co–defendant's out–of–court admissions are both "clearly inculpatory as to the defendant *and* vitally important to the Government's case . . . ." *United States v. Knuckles*, 581 F.2d 305, 313 (2d Cir. 1978) *cert. denied* 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978) (emphasis added). Defendants have not specified which statements, if any, would present *Bruton* problems. The only statement that developed during the hearing was that of David Lace following his arrest. These statements did not refer by name to any of the other defendants. Furthermore, their probative value, when compared with the other evidence that surfaced in the suppression hearings, is relatively slight. The court can successfully limit the effect of these statements, if any, on co–defendants' confrontation rights.

■ Defendants' general claim that the jury will be confused by the large number of defendants and will thus find guilt by association is without merit. Defendant David Lace's claim based upon his intention to call Southam's attorney, Mr. Ryan, as a witness must also fail. There is no indication as to what Mr. Ryan's testimony might be. Defendant Lace has not demonstrated that denial of a severance would substantially prejudice his trial in this regard. *United States v. Sotomayor*, 592 F.2d 1219, 1228 (2d Cir. 1979) *cert. denied sub nom. Crespo v. United States*, 442 U.S. 919, 99 S.Ct. 2842, 61 L.Ed.2d 286 (1979).

The court denies defendants' motions to sever.

*Miscellaneous Motions*

1. *Telephone Toll Records*

■ The defendant Pollack complains that the Drug Enforcement Administration procured his telephone toll records by subpoena as an invasion of privacy. Subpoena power is granted to the DEA under 21 U.S.C. § 878(2). The claim is without merit. There is no legitimate expectation of privacy in the business records of a third person, *e. g. Couch v. United*

*States,* 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973), much less in the public records required to be kept by a regulated business enterprise. *Davis v. United States,* 328 U.S. 582, 593, 66 S.Ct. 1256, 1261, 90 L.Ed. 1453 (1946).

No evidence was presented by the defendant Pollack to support his remaining motions to suppress and they must be denied.

### 2. *Multiplicity*

Defendants David Lace and Ducharme object to the indictment on the ground of multiplicity. Decision on this question depends upon proof presented at trial. Dismissal is an inappropriate remedy to cure multiplicity. A proper procedure is to move that the prosecutor elect between counts at the close of the Government's case. *United States v. Ketchum,* 320 F.2d 3, 8 (2d Cir. 1963).

### 3. *Speedy Trial Act*

Several of the defendants have moved to dismiss the case on speedy trial grounds. The court denied defendant Eckman's extensive claim of pre–indictment delay in an order filed September 15, 1980. The other defendants advance no additional or different claims than those raised by Eckman. Consequently, the remaining speedy trial claims must also be denied.

The time fixed for trial in the order which follows, after accounting for allowable excludable periods under the provisions of 18 U.S.C. § 3161(h), is within the seventy day limitation imposed by 18 U.S.C. § 3161(c)(1).

### 4. *Other Motions*

Defendants have filed over 80 pretrial motions in this proceeding. The discovery motions were considered and dealt with by the Government's voluntary disclosure under Local Rule 15 or by oral decision by the court. Those motions that remain undecided at this juncture include Ducharme's motion to dismiss for misjoinder of charges, Butts' motion to dismiss for violations of the Government's Petite policies, and Daniel Lace's motion to dismiss for failure to

charge the offense in clear and concise terms. The remaining motions lack merit, and the court will deny them.